**[Cite as *State v. Thompson*, 2021-Ohio-1344.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-19-1289

      Appellee                              Trial Court No. CR0201902316

v.

Goldy Thompson                           **DECISION AND JUDGMENT**

      Appellant                             Decided:  April 16, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Thomas P. Kurt, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} This matter is before the court on appeal of the judgment of the Lucas County Court of Common Pleas which, after a jury trial, sentenced appellant, Goldy Thompson, to a term of imprisonment of 7 years to 10 years and 6 months.  For the reasons that follow, we affirm.

## II. Background and Procedural History

{¶ 2} On June 25, 2019, police were called twice to Troy Street, in Toledo, Ohio, several hours apart. The first call came around 1:30 a.m., with three separate 911 calls indicating an injured person or persons. One of the 911 callers also mentioned gang activity.

{¶ 3} Police dispatch directed officers to respond and check the safety of a female on Troy Street. They arrived and found the victim, H.T., bleeding from the head and face. H.T. was in a vehicle with her roommate, Joyce, and Joyce's 16-year-old daughter, M. The women directed police to appellant's home at 405 Troy Street.

{¶ 4} As officers approached the front door, they noted blood on the sidewalk and on the door. They knocked but no one appeared to be home. The women then directed officers across the street to an apparent abandoned home, at 326 Troy Street, identified by Joyce and her daughter as the site of an additional attack. Officers noted more blood upon approaching that address, and recovered a bloody tire iron on the side of the house, next to some trash cans. The officers at the scene wore body cameras, and still photos were taken from the footage documenting the blood and discovery and collection of the tire iron.

{¶ 5} An ambulance transported H.T. to the hospital where she received treatment for her injuries. Detective Sherri Wise met H.T. at the hospital and noted her physical condition, including blood on her back and face and a large, swollen welt on her left arm. H.T.'s medical records indicated several lacerations on H.T.'s head, including a

2.

three-centimeter wound in the left posterior occipital region that required stitches, a four-centimeter wound on the scalp that required staples, and a six-centimeter wound in the right lower occipital area that required stitches. Detective Wise interviewed H.T. in the hospital, and learned H.T. knew her assailant only by a nickname, "X." H.T. was admitted to the hospital for treatment.

{¶ 6} Officers responded to a second call for a safety check at 405 Troy Street later that same day, around 2:00 p.m. Appellant's sister discovered blood at the home and called police after she failed to locate appellant. The responding officers noted the blood on the sidewalk, door frame, and door, and upon entering the residence to search for appellant, they discovered more blood on the floor of the living room and kitchen. After the officers failed to find appellant, they filed a missing person report.

{¶ 7} By this time, police had identified the resident at the address as appellant, and Detective Wise compiled a photo array that included appellant's picture. Sergeant Eric Kenney assisted Wise by showing H.T. the photo array. H.T. identified appellant as her assailant from the array. Subsequent forensic testing confirmed the presence of blood on the tire iron, recovered from the house at 326 Troy Street, and that blood was conclusively linked to H.T. Testing also identified both H.T.'s and appellant's DNA on the tire iron handle.

{¶ 8} After the early morning of June 25, H.T. never saw Joyce or her daughter again. Aside from questioning at the scene, police were not able to locate Joyce or M. for additional interviews, and neither Joyce nor M. could be located for trial.

3.

{¶ 9} On July 31, 2019, appellant was indicted on a single count of felonious assault in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree. He was arraigned on August 8, 2019, entered a plea of not guilty through appointed counsel, and was ordered to have no contact with the victim. The matter proceeded to a jury trial on November 4 through 6, 2019.[1]

{¶ 10} At trial, Detective Wise, Sergeant Kenney, and Heather Bizub of the Ohio Bureau of Criminal Investigation testified regarding the investigation and forensic findings. Pertinent to this appeal, various officers testified regarding their response to the scene of the assault, with appellant's trial counsel raising numerous objections based on hearsay.

{¶ 11} Officer Austin McCarthy testified that he and his partner responded to a 911 call. The pair were the first to arrive on Troy Street in response to the request for a safety check of an injured woman and a report of a potential kidnapping of a 16 year old. They found the 16 year old, M., in the front seat of a car, with a woman, later identified as Joyce, holding an injured H.T. in the back seat of the car. H.T. was semi-conscious and bleeding heavily from the head and face. After a rescue crew arrived to tend to H.T., Officer McCarthy testified, over appellant's objection, that he was directed to 405 Troy

---

[1] Unrelated to this appeal, the defense moved for a mistrial in the midst of jury selection, citing perceived irregularities in the peremptory challenge process, and the trial court denied the motion. Appellant does not raise this issue in the present appeal.

Street, as the scene of the assault, by both Joyce and the victim, and he and his partner proceeded to that address.

{¶ 12} As they approached, Officer McCarthy noted blood around the door. He attempted, without success, to contact someone inside the home. McCarthy testified, once more over appellant's objection, that he and his partner then crossed the street to an abandoned house, 326 Troy Street, again based on statements made by the women regarding another assault at that location. He noted blood on the door of that house and entered, but found no one inside. McCarthy testified that another officer discovered a bloody tire iron outside the abandoned house, and McCarthy collected and logged it in as evidence.

{¶ 13} Officer Bradley Knapp testified that he and his partner also responded to the scene. He indicated a medical crew was already there when he and his partner arrived, assessing and treating three females. Officer Knapp testified that his command officer sent him to 326 Troy, a vacant house, to secure the scene of a suspected assault. He believed the house was vacant because "all the doors, windows [were] open, broken, either broken in to or not sealed" and the "grass was kind of overgrown."

{¶ 14} Officer Knapp proceeded to the side of the house, off the driveway, and located a bloody tire iron near a line of garbage cans next to the house. He entered the house through the side door and noted dried blood on the back of the door. Still photos from Officer Knapp's body cam, showing the trash cans near the side door, were

5.

introduced into evidence. The tire iron was also admitted as evidence, and displayed for the jury.

{¶ 15} Officer Rodolfo Garcia testified that he responded to the safety check call, along with seven other units, because he was in the area. While he did not interview the victims, he observed them and testified that they appeared upset, and one had an apparent head injury. Based on statements, he indicated the women were at the address to sell a dog, and were assaulted at the residence at 405 Troy Street. Officer Garcia testified he walked to the residence and saw blood spatters leading up to the porch, and blood stains on the front door handle. He knocked on the door but received no response. Photographs of the front porch, with another officer shining a light on the blood, were shown to the jury.

{¶ 16} Officer Andrew Crisp testified that he responded to a subsequent call for a safety check of appellant, placed by appellant's sister. Officer Crisp assisted two K-9 units already on scene, and searched the house, backyard, and garage in an attempt to locate appellant. He noticed blood on the sidewalk leading to the house, and blood on the door frame and door. Inside the house, there was more blood on the floor in the living room and kitchen.

{¶ 17} Appellant's trial counsel objected to testimony regarding statements made to police by Joyce and M., directing police to either of the houses and mentioning a kidnapping. The prosecutor argued that the statements were not hearsay, because they

6.

were offered to explain the officers' actions in investigating the scene. The trial court overruled the objections.

{¶ 18} During Detective Wise's testimony, appellant again objected to mention of separate, uncharged crimes contained within Joyce's and M.'s statements to police. In a side bar, appellant's trial counsel moved for a mistrial, arguing the hearsay statements were unduly prejudicial, and the alleged victims were never located after the date of the incident. The prosecutor argued that the statements were not hearsay, but merely illustrated the reason police looked at the second house as part of their investigation. The trial court denied the motion for mistrial, and indicated it would provide a curative instruction to the jury.[2]

{¶ 19} On cross-examination, appellant's trial counsel also questioned the officers about gang activity in the vicinity of the Troy Street neighborhood. Officer McCarthy acknowledged there had been mention of a gang in one of the 911 calls, but after arriving on the scene, McCarthy observed no gang activity. He further testified, over objection, that H.T., the other woman, and the 16 year old made no mention of gang activity.

---

[2] No contemporaneous instruction was provided, with the trial court instead providing the following explanation to the jury:

> The purpose of this side bar and prior side bars is to protect against any prejudice to the defendant and that relates to other stuff that's been—that's I think other things that were part of this investigation but are not related to the felonious assault per se. So I just instruct the jury that we are here for a felonious assault case and nothing more, okay? All right. State is cautioned.

Officer Knapp testified that he was aware of gang activity in the general area, but had no knowledge whether gangs controlled Troy Street. Officer Knapp admitted the possibility the vacant house had been used by gangs or drug dealers. Officer Garcia indicated he was unaware whether the Troy Street area had a lot of gang activity.

{¶ 20} H.T. also testified. She stated she is a heroin addict, and she needed money for bills. She and her roommates, Joyce and M., went to appellant's home to show him a puppy they had for sale. H.T. knew him by a nickname, "X," but identified appellant at trial as that same individual. The two women and M. smoked crack with appellant, and after appellant decided he did not want the puppy, they left and took the puppy home. Later that night, H.T. received a text from appellant, asking her to come back to the house. H.T. testified that appellant said he had something to give her for her birthday, which was the next day, and she believed he would give her drugs. H.T., Joyce, and M. all returned to 405 Troy Street, and H.T. testified that she brought some water jugs to fill at appellant's house, because the water was turned off at her house.

{¶ 21} Appellant let the women in, and as H.T. was filling her water jugs, she felt something strike the back of her head. She turned and saw appellant swinging something at her head and screamed for Joyce and M. When Joyce and M. came to her aid, appellant went after them. H.T. testified that she chased after appellant and attacked him to stop him from hurting M., who was a child. Appellant turned back to H.T., beating her on the head, and H.T. tried to block the blows with her arm and attempted to shelter under a chair. She asked appellant to stop, but he accused her of stealing. H.T. later

8.

concluded that one of her roommates took cocaine from appellant's home during their earlier visit.

{¶ 22} H.T. testified that her memory of the evening was not complete, but she remembered finding herself in the alley, covered in blood, and asking random neighbors for help. She eventually found Joyce, who put her in the car. H.T. asked Joyce to take her to the hospital, but Joyce indicated her daughter was missing, and left H.T. in the car to look for M. Eventually, M. returned to the car from the direction of the vacant house, and police arrived.

{¶ 23} Appellant's trial counsel questioned H.T. about her drug addiction on cross-examination. H.T. admitted using heroin beginning in 2015, and after getting treatment, relapsing in 2018, around the time she lost custody of her three children. H.T. testified she snorted heroin about every other day, but Joyce introduced her to crack, which H.T. used sporadically with Joyce in the months leading up to the assault. Despite her drug addiction, H.T. maintained employment with a construction crew, and typically worked a six-day work week.

{¶ 24} H.T. admitted to living in appellant's neighborhood years before, but denied ever buying drugs in that neighborhood. Over the objection by the prosecution, defense counsel was permitted to question H.T. regarding gangs. H.T. denied observing gang activity in the neighborhood when she lived there, denied knowing any gang members, and denied knowing of any gang members selling drugs in the neighborhood. H.T. also testified that she was not familiar with the vacant house at 326 Troy Street.

9.

Appellant's trial counsel did not ask any questions regarding a drug debt owed to gang members, and H.T. was adamant that she was assaulted by someone she knew, albeit by a nickname, "X." As previously stated, H.T. identified appellant as the person known to her as "X."

{¶ 25} At the close of testimony, the prosecution moved exhibits into evidence and rested its case. Appellant rested without presenting any testimony, and without any indication that appellant wished to testify.

{¶ 26} During closing argument, the prosecution characterized the issues as undisputed, with the exception of who attacked H.T. As to identity, the prosecution argued the physical evidence proved appellant assaulted H.T., including the blood in appellant's home, the blood on the tire iron, and appellant's DNA on that tire iron. Additionally, the prosecution emphasized H.T.'s testimony, and her subsequent identification of appellant from the photo array.

{¶ 27} Appellant's trial counsel disputed the identity of the assailant, and attempted to introduce a theory of gang violence. In support, counsel pointed to the third 911 call, and played that call for the jury. He then argued:

> Now, this man who identifies himself by his name and address on Troy Street dials 911, and among the things I hear him reporting is gang violence, he then mentions a group of kids, and he says roughly 20 kids. He says a girl 16, they took her. When asked by the 911 operator, he says, they are teenagers. He mentions a detective assigned to our street. A

10.

response to the operator's questions saying that they are black. He says he definitely needs police because this is a gang. Then he adds, this is retaliation for a report earlier today. And he tells the operator they jumped her, broke or busted her arm and leg.

Now, Detective Wise downplayed this recorded account and even though she had the name and address of the caller on Troy Street, she didn't bother to [follow up] and find out what this man saw and heard in his own neighborhood or when he saw and heard it. The detective stuck her head in the sand and decided not to pursue it[.] * * * But this 911 recording sounds to me that the caller was certain about what he was witnessing and what he had witnessed. He knew that [M.] had gone missing for some time. And that she was 16 years old. He was sure that it involved a gang of about 20 teenagers. So who are those of us who were not present at that time to question the sincerity and credibility of this good Samaritan?

Trial counsel then summarized the testimony of the various officers, indicating gang activity in the area was possible.

{¶ 28} After appellant's trial counsel ventured into media portrayal of gang activity and argued the house at 326 Troy Street was described as "being owned by the neighborhood, meaning that drug sellers and gang bangers will use such property to accomplish their purposes," the prosecution objected to this particular argument, stating

counsel was "arguing facts that have not been submitted into evidence to this jury."  The trial court sustained the objection and cautioned the defense.

{¶ 29} Trial counsel continued with his gang theory, emphasizing that H.T. is a heroin addict and gangs sell drugs.  He argued the possibility that H.T. was assaulted at 326 Troy Street and ran to appellant's home "to escape the gang violence."  The prosecution objected to trial counsel's theory that H.T. "got behind in her payments to [the gang] they attacked her to teach her a lesson and to get her to pay her drug debt."  The trial court sustained the objection, and the following sidebar occurred:

Defense counsel:  This is a key argument for the defense, okay.  As much as I respect you, I think the court is leaving [its] neutral and detached perspective.

Trial court:  That [has] nothing to do with it.  I think – look, I believe the jury has the ability to draw the inferences based on your theory, but to – I think you're now pulling I think that theory is too elaborate now.  I mean I just I think you haven't starting to provide, in my opinion, what appears to be – I really – it's not evidence, but man, it's really stretched to get to that, that's a very specific theory that has no foundation, no evidence supporting – no evidentiary support for it.  I mean if they draw that inference on their own, that is one thing, but * * * you're putting that – you're putting that in their heads.

Defense counsel: You're right, that is exactly what my job is as defense counsel is to do.

Trial court: I understand that, but it's [supposed] to be based on the evidence presented in trial, and you are going way beyond that now. I mean if they draw that on their own, that is one thing. You're giving it to them on a platter and I –

\* \* \*

I don't know that the evidence was presented, any evidence to go with that specific and elaborate of theory. So I am sustaining the objection. I understand what you're saying, I understand.

Trial counsel then proffered his argument for the record, out of the hearing of the jury, as follows:

My argument in this respect would be I expect the truth is [H.T.] knows the gang members in that neighborhood and that she regularly bought her drugs from them. She probably got behind in her payment to them and they attacked her to teach her a lesson and get her to pay her drug debt. The gang bangers used a tire iron they had probably stolen from [appellant's] garage or from the bed of his truck and then told her that she had better not snitch them out, and that if she was asked by police who did this to her, she should tell the police that the guy who lived at 405 Troy Street did it to her. We don't have a burden of proof, my only aspiration as

defense counsel is to raise a reasonable doubt and I think that's what this argument goes to, and I think the juror should be free to draw those conclusions if they wish to go there.

{¶ 30} On November 6, 2019, the jury returned a verdict of guilty on the sole count of felonious assault. As sentence, the trial court imposed a prison term of 7 years to 10 years and 6 months. From this judgment, appellant filed a timely appeal.

### III. Assignments of Error

{¶ 31} Appellant asserts the following as error on appeal:

I. The trial court's admission of hearsay testimony violated appellant's right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

II. The trial court's refusal to allow appellant's trial counsel to make reasonable argument in his closing statement violated appellant's right to a fair trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

### IV. Analysis

{¶ 32} Appellant raises two issues as error. First, appellant argues admission of hearsay violated his right to confront witnesses offering testimony against him. Second, appellant argues the trial court violated his right to a fair trial by restraining his closing argument and preventing him from offering his theory that H.T. was beaten by gang

14.

members as a consequence of not paying her drug debt to a drug-dealing gang. We address each assignment of error in turn.

## A. Hearsay

{¶ 33} In his first assignment of error, appellant argues impermissible hearsay relative to five, specific statements offered at trial. Appellant contends that these statements violated his Confrontation Clause rights. In response, the state argues that the statements were not hearsay, as they were offered for the purpose of explaining the steps taken in the investigation, and therefore, there were no confrontation rights violated.

{¶ 34} Hearsay is a statement made by someone other than the declarant while testifying, "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). The Confrontation Clause of the Sixth Amendment to the United States Constitution bars testimonial statements made by a declarant not appearing at trial so that an accused may cross-examine that declarant. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 214, citing *United States v. Crawford*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177. "Only testimonial hearsay implicates the Confrontation Clause." *Ford* at ¶ 214, citing *Crawford* at 59, fn. 9; *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 186.

{¶ 35} While hearsay may not be permitted, an out-of-court statement is not hearsay and is admissible if it is offered for a different purpose. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 169, citing *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118. Here, the state argues that the

15.

statements were offered to explain the investigatory steps taken by the officers. "Testimony to explain police conduct is admissible as nonhearsay if it satisfies three criteria: (1) the conduct to be explained is relevant, equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) the statements do not connect the accused with the crime charged." *Beasley* at ¶ 172, citing *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.

{¶ 36} The first two statements challenged by appellant clearly satisfy the criteria for admissibility as statements explaining conduct. Appellant objects to Officer McCarthy's testimony that "it was relayed to us that this is where it all took place, the incident," and Officer Knapp's testimony that his command officer directed him to 405 Troy Street because "the victims were at that location and basically an assault occurred there and to look for any kind of evidence or a scene as we call it." Each of these statements explain contemporaneous steps the officers took in their investigation and make no mention of appellant to connect him with the crime of felonious assault. Appellant, moreover, argues no resulting prejudice, based on these statements.

{¶ 37} Appellant also challenges the testimony of Detective Wise, indicating that "one of the victims had pointed out a second house in which she stated the [appellant] had taken her." Appellant contends this testimony is "obviously hearsay" and "testimonial in nature," but provides no argument in support. We find the statement was not inadmissible as hearsay. It was not offered to prove that appellant took the declarant

to the second house, but, at trial, the statement was offered to explain the progression of the investigation, from 405 to 326 Troy Street. Accordingly, the content of the statement was offered to explain the conduct of officers as they pursued their investigation, and not as substantive evidence of a crime. Although Detective Wise mentioned appellant, it was not in connection to the assault of H.T. or any other person.

{¶ 38} In the alternative, the state argues that each of these statements constituted excited utterances heard by officers as they responded to the scene. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition[,]" and the availability of the witness has no bearing on admissibility. *State v. Wallace*, 37 Ohio St.3d 87, 88, 524 N.E.2d 466 (1988), quoting Evid.R. 803(2). Appellant argues there was no basis for an "excited utterance," despite the fact that H.T. was bleeding in the arms of Joyce in the car when officers arrived, with M. having just returned after Joyce went in search of her missing daughter. Considering these circumstances, largely ignored by appellant's argument, admission of the statements did not constitute error.

{¶ 39} The fourth statement challenged by appellant was elicited in response to his trial counsel's questioning regarding the presence of gang activity in cross-examination of Officer McCarthy. In redirect, appellant objected to Officer McCarthy's testimony that neither Joyce nor her daughter indicated that "this was some type of gang involvement situation." In context, the prosecutor asked Officer McCarthy if he saw any evidence of gang activity when he arrived on scene, or if any of the three women

17.

indicated gang involvement. Appellant characterizes Officer McCarthy's testimony that none of the women alerted him to gang activity as nonverbal hearsay by Joyce and her daughter.

{¶ 40} While wordless conduct may constitute hearsay, "[n]onverbal conduct is hearsay only when it is intended by the actor to be an assertion of his [or her] belief." *State v. Kniep*, 87 Ohio App.3d 681, 685, 622 N.E.2d 1138 (9th Dist.1993); *State v. Turner*, 6th Dist. Erie No. E-94-063, 1995 WL 803842 (Dec. 8, 1995); *see also* Evid.R. 801(A) (defining a statement to include "nonverbal conduct of a person, if it is intended by the person as an assertion"). Here, based on the context of the statement, we find no attempt to introduce a statement by Joyce or her daughter through Officer McCarthy's testimony, because the testimony did not demonstrate that either Joyce or her daughter were ever asked about gang involvement. Thus, the failure of Joyce and her daughter to mention gangs was not an assertion in response to any query, and there was no nonverbal hearsay as argued by appellant.

{¶ 41} The final statement challenged by appellant is Officer Garcia's testimony that he overheard "the victims" state that "they [were] sent to an address on Troy because they were trying to sell a dog to an individual." Appellant contends that the statement by "the victims" is hearsay because it was offered to corroborate H.T.'s narrative of events. However, appellant's argument does not align with the testimony. H.T. testified she went to appellant's home the first time to show him the puppy, and the potential sale of the puppy had no relation to the assault, which occurred during the second visit to appellant's

18.

home. While Officer Garcia may have attributed H.T.'s presence at appellant's home at the time of the assault for the purpose of selling a dog, H.T. herself testified that she went back to appellant's home relative to the assault because appellant promised her something, maybe drugs, for her birthday. H.T. then testified that, instead of drugs, she received a beating.

{¶ 42} Appellant argues that the prosecution offered the five statements to prove the matters asserted, and that the cumulative effect of the statements resulted in denial of his right to confront witnesses and prejudice. We disagree. Each statement was either introduced to explain the conduct of the officers, an excited utterance, or was not a statement offered to prove the truth of the matter asserted. Therefore, with no testimonial hearsay contained within the statements, there could be no Confrontation Clause violation. Furthermore, while appellant generally argues prejudice, he points to nothing in the record in support, and our own review demonstrates no prejudice. Appellant's first assignment of error, accordingly is without merit and found not well-taken.

## B. Permissible Inference

{¶ 43} In his second assignment of error, appellant argues the trial court prevented him from pursuing his gang violence theory to demonstrate H.T.'s version of events was not credible. Appellant notes he pursued this theory throughout trial, including questioning the officers and H.T. regarding gang involvement. His trial counsel also stipulated to the admission of unredacted 911 recordings, including one in which the caller indicated gangs caused H.T.'s injuries.

19.

{¶ 44} Trial counsel is generally given wide latitude in closing argument, and we will not reverse based on limitations to argument absent an abuse of discretion by the trial court. *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E.2d 768 (1984). An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 45} In this case, appellant's trial counsel pursued his theory of gang violence throughout closing, with the prosecution only objecting to specific statements, unsupported by the record, regarding H.T.'s knowledge of gang members, her drug debt to those gang members, the gang's theft of the tire iron from appellant's truck, and the gang's instruction to H.T. to blame appellant for her injuries. None of these specific facts, which trial counsel attempted to introduce in closing argument, were facts introduced into evidence during trial.

{¶ 46} The wide latitude permitted in closing argument has limits, including permitting argument which does not "address what the evidence has shown and what reasonable inferences may be drawn from that evidence." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 306, citing *Loza* at 78. Trial counsel may enthusiastically advocate their position and "freely discuss the facts, arraign the conduct of parties, impugn, excuse, justify or condemn motives according to the evidence, and attach the credibility of witnesses when the record supports the same[,]" but this does not

20.

permit counsel to "misrepresent evidence[.]" *Ford* at ¶ 306, citing *State v. Powell*, 177

Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, ¶ 45 (4th Dist.).

{¶ 47} Contrary to appellant's argument, his trial counsel pursued his gang theory

through his closing argument, and the only limitation placed by the trial court pertained

to specific, fact-based scenarios which trial counsel sought to introduce, with these

scenarios lacking evidentiary support in the record, such as H.T.'s drug debt or the gang

members theft of the weapon used in the assault. "Neither the defense nor the

prosecution may refer to evidence that is not in the record." *State v. McKelton*, 148 Ohio

St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 286, quoting *State v. Brown*, 38 Ohio St.3d

305, 316, 528 N.E.2d 523 (1988), fn. 7. With no evidence to support trial counsel's

addition of specific facts to support his gang theory, we find no error by the trial court in

limiting closing argument to the evidence within the record. Appellant's second

assignment of error, therefore, is not well-taken.

## V. Conclusion

{¶ 48} For the forgoing reasons, we affirm the judgment of the Lucas County

Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to

App.R. 24.

Judgment affirmed.

21.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                     _____
           JUDGE

Gene A. Zmuda, P.J.

           _____

Myron C. Duhart, J.                     JUDGE
CONCUR.

           _____
           JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.